**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CITY OF INKSTER POLICEMEN AND FIREMEN RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>THE SCOTTS MIRACLE-GRO COMPANY, JAMES HAGEDORN, CHRISTOPHER J. HAGEDORN, MATTHEW E. GARTH, DAVID C. EVANS, and CORY J. MILLER,<br><br>     Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff City of Inkster Policemen and Firemen Retirement System ("Inkster P&F" or "Plaintiff"), by and through counsel, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by The Scotts Miracle-Gro Company ("Scotts" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, and conference calls concerning Defendants' public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (as defined herein).

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities who purchased Scotts common stock between June 2, 2021 and August 1, 2023, inclusive (the "Class Period") against Scotts and certain of its officers and executives, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Based in Marysville, Ohio, Scotts is one of the world's largest marketers of branded consumer products for lawn and garden care. The Company's main brands are Scotts, Miracle-Gro, and Ortho. The Company sells most of its products through third-party distributors. Scotts is the exclusive agent of Monsanto for distribution of its consumer Roundup products. In 2014, Scotts formed a wholly owned subsidiary, The Hawthorne Gardening Company ("Hawthorne"), which focuses on hydroponics for the emerging cannabis growing market. Throughout the Class Period, the Company divided financial results into three reportable segments: U.S. Consumer, Hawthorne, and Other. The U.S. Consumer and Hawthorne segments generated more than 90% of the Company's reported Class Period revenue.

3.      Prior to the start of the Class Period, in 2020 and 2021, Scotts faced surging demand for its products prompted by the COVID-19 pandemic. At the time, the Company lacked sufficient inventory to meet demand and missed out on millions of dollars in sales. To keep up with the demand, Scotts significantly increased its inventory for both its U.S. Consumer and Hawthorne segments to "ensure [it] could service the needs of [its] retail partners." However, the Company promptly realized that it had purchased more inventory than consumers demanded. Rather than write down the excess inventory or disclose the issue to investors, Defendants instead engaged in a scheme to saturate Scotts' sales channels with more inventory than could be sold to consumers. Through this scheme, Scotts booked the sales to its distributors as revenue. Those revenues

2

enabled the Company, which was highly leveraged, to maintain debt-to-earnings ratios at levels barely exceeding those required by the Company's debt covenants.

4.     Specifically, leading up to the Class Period, Scotts had entered into senior secured credit facilities containing various restrictive covenants and cross-default provisions requiring that the Company maintain certain financial ratios.  For example, a key covenant required Scotts to maintain a debt-to-earnings before interest, taxes, depreciation, and amortization ("EBITDA") ratio of less than 6.25.  Any breaches of these covenants could result in a default, enabling the Company's lenders to declare all outstanding indebtedness immediately due and payable.  This dynamic created an incentive for the Company to saturate its sales channels with inventory to avoid breaching its debt covenants.  Indeed, at the start of the Class Period, Scotts held $2.3 billion of debt—which ballooned to nearly $3.1 billion of debt by the end of the Class Period.

5.     After the close of markets on June 1, 2021, Scotts announced that it had increased sales and earnings guidance for 2021 "based on the continued strength of both its U.S. Consumer and Hawthrone segments."  A few months later, during the Company's earnings call for the fiscal third quarter of 2021, Defendants highlighted that Scotts had a "good line of sight [on inventory levels], which gives us a high degree of confidence in our guidance[.]"[1]

6.     Throughout the rest of the Class Period, Scotts repeatedly assured investors that its inventory levels were appropriate, that it was experiencing peak or record sales periods, and that the Company was going to stay in compliance with its debt covenants.  Indeed, after multiple months of saturating the sales channel, Defendants continued to assure investors that channel inventories were not a problem.  For example, during the Company's earnings call for the fiscal fourth quarter of 2021, Defendants assured investors: "[A]s it relates to inventory, we find

---

[1] Scotts reports financial results based on a fiscal year ending on September 30 of a given year.

ourselves in a very good place right now." Similarly, during the Company's earnings call for the fiscal first quarter of 2023 on February 1, 2023, Defendants maintained that the Company "[didn't] have [an] inventory problem at all." Scotts further attributed its strong sales to "selling through high-cost inventory," which yielded "peak selling" and "record shipments."

7. Regarding its debt covenants, during the Class Period, Scotts touted that the Company had topped its internal targets for results and had "net leverage of 5.9 times debt-to-EBITDA comfortably within covenant maximum of 6.25 times." The Company also stated it was "optimistic we will remain within the bounds of our bank covenants" and did "not see leverage compliance issues going forward." The Company also claimed it was "tracking to do even better" than its guidance, which was "really, really important for [Scotts] to avoid covenant hell."

8. These statements, and similar statements made by Defendants during the Class Period, were materially false or misleading because, in reality, Scotts was pushing products through its sales channels at a pace that outstripped demand. As the Company recognized that its supply of inventory far exceeded consumer needs, Defendants engaged in a scheme to saturate the Company's sales channel with more products than those retailers could sell through to consumers. Further, and as the Company admitted at the end of the Class Period, Scotts was critically close to violating its debt covenants and would have needed an "exceptional year" to remain in compliance with its covenants.

9. Ultimately, Scotts was only able to meet the conditions of its debt covenants through this channel-stuffing scheme. Tellingly, in the fiscal fourth quarter of 2022, Scotts even changed its approach toward calculating Adjusted EBITDA—the main metric used to calculate the Company's compliance with its debt covenants—in order to stay within the bounds of its debt

covenants. As a result of these misrepresentations, Scotts common stock traded at artificially inflated prices throughout the Class Period.

10.     The truth began to emerge on June 8, 2022, when Scotts issued a press release disclosing that replenishment orders from its U.S. retailers were more than $300 million below target in the month of May alone. As a result, Defendants revealed to investors that the Company was forced to cut its guidance by nearly 50% for 2022 full-year earnings per share and planned to take on additional debt to cover restructuring charges as it attempted to cut costs.

11.     This news shocked the market, as the dramatic cut to guidance came just weeks after the Company promised that it was "tracking to do even better" than its guidance. Indeed, analysts at Truist reported, "[w]e have not seen anything similar occur in the 20 years we have covered [Scotts]."

12.     In reaction to this news, the price of Scotts common stock shares declined by $9.05 per share, or nearly 9%, from a closing price of $102.18 per share on June 7, 2022, to a closing price of $93.13 per share on June 8, 2022.

13.     Throughout the rest of the Class Period, Defendants continued to mislead the market by downplaying the Company's excess inventory and debt covenants compliance issues.

14.     The full truth was disclosed before the markets opened on August 2, 2023, when Scotts issued a press release revealing that quarterly sales for the fiscal third quarter of 2023 had declined by 6%, and that gross margins had fallen by 420 basis points. The Company also slashed its fiscal year EBITDA guidance by a staggering 25% and announced a $20 million write-down of "pandemic driven excess inventories." The Company further disclosed that it had to modify its debt covenants to 7.00 times debt-to-EBITDA ratio, from the former 6.25 times debt-to-EBITDA

ratio.  As J.P. Morgan analysts reported the following day, in conjunction with the modification, Scotts had to "downsize[] its credit facility by $250[ million]."

15.     Analysts were again surprised by the "historic cut to [earnings per share]," as Wells Fargo proclaimed that the "historic cut" was a "[t]otal earnings destruction[,]" leading to "one of the worst years on record" for Scotts.

16.     On this news, the price of Scotts common stock shares fell $13.58 per share, or 19%, from a closing price of $71.44 per share on August 1, 2023, to a closing price of $57.86 per share on August 2, 2023.

17.     As a result of Defendants' wrongful acts and omissions, and the resulting decline in market value of the Company's common stock when the truth was disclosed, Plaintiff and other class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as Scotts is headquartered in this Judicial District.

21.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

22.    Based in Inkster, Michigan, Plaintiff City of Inkster Policemen and Firemen Retirement System administers a retirement benefit plan with approximately $25 million in assets on behalf of more than 100 active, retired, and vested inactive members and their beneficiaries. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Scotts common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

23.    Defendant Scotts is incorporated under the laws of Ohio, with its principal executive offices located in Marysville, Ohio. Scotts common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "SMG."

24.    Defendant James Hagedorn ("CEO Hagedorn") has served as Chief Executive Officer ("CEO") and Chairman of the Board at Scotts since 2001 and 2003, respectively.

25.    Defendant Christopher J. Hagedorn ("Division President Hagedorn") has served as Executive Vice President and Division President of Hawthorne at Scotts since January 2021.

26.    Defendant Matthew E. Garth ("Garth") has served as Chief Financial Officer ("CFO") and Executive Vice President at Scotts since December 2022.

27.    Defendant David C. Evans ("Evans") served as Interim CFO at Scotts from August 2022 to December 2022.

28.     Defendant Cory J. Miller ("Miller") served as Scotts' Executive Vice President and CFO from January 2021 to August 2022. Miller also served as Vice President of Finance of Hawthorne from 2016 to 2020.

29.     Defendants James Hagedorn, Christopher J. Hagedorn, Garth, Evans, and Miller (collectively, the "Individual Defendants"), because of their positions with Scotts, possessed the power and authority to control the contents of, among other things, Scotts' quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Scotts' reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

30.     Scotts and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

31.     Scotts is one of the world's largest marketers of branded consumer products for lawn and garden care. Most of the Company's revenue is generated from the U.S. Consumer and Hawthorne business segments, and most of its products are sold through third-party distributors. After missing out on pandemic-induced sales opportunities in 2020 and 2021 due to a lack of

inventory, the Company significantly increased its inventory for both its U.S. Consumer and Hawthorne segments.

32.     However, the Company quickly realized that it had purchased too much inventory. Rather than write down the inventory or otherwise disclose the issue to investors, Defendants engaged in a scheme to saturate the Company's sales channels with more inventory than could be sold to consumers, enabling Scotts to book the sales to its distributors as revenue. As Scotts was highly leveraged with its credit facilities containing restrictive debt covenants, Defendants' scheme allowed the Company to maintain debt-to-earnings ratios that just barely exceeded those required by its debt covenants to stay in compliance and avoid a default.

33.     Indeed, the EBITDA calculations offered to investors by Scotts were tied to the Company's debt covenants. As explained in Scotts' press releases throughout the Class Period, the "presentation of Adjusted EBITDA is intended to be consistent with the calculation of that measure as required by the Company's borrowing arrangements, and used to calculate a leverage ratio."

## Defendants' Materially False and Misleading Statements

34.     The Class Period begins on June 2, 2021. After the close of the markets on June 1, 2021, Scotts issued a press release announcing it had "increased sales and earnings guidance for fiscal 2021 based on the continued strength of both its U.S. Consumer and Hawthorne segments" and that the Company now expected "company-wide sales growth of 17 to 19 percent." The following day, during the William Blair & Company 41st Annual Growth Stock Conference on June 2, 2021, CFO Miller provided additional commentary on the increased guidance and reiterated that, despite prior seasonality issues, "we're still raising our guidance . . . on sales in both the U.S. Consumer business and Hawthorne." CFO Miller then explained that the Company

"now expect[s] growth of 7% to 9% in the U.S. Consumer business versus a previous guidance range of 4% to 6%." For Hawthorne, CFO Miller highlighted that Scotts "now expect[s] growth of 40% to 45% versus a previous range of 30% to 40%."

35.     On August 4, 2021, Scotts issued a press release announcing its financial results for its fiscal third quarter of 2021, which ended on July 3, 2021. During the accompanying earnings conference call, CFO Miller reported that for the U.S. Consumer business, Scotts has been replenishing "categories to keep the stores at the right level of inventory[,]" emphasizing that Scotts has a "good line of sight here, which gives us a high degree of confidence in our guidance[.]"

36.     On November 3, 2021, Scotts issued a press release announcing its financial results for the fiscal fourth quarter and full year of 2021, which ended on September 30, 2021. Therein, Scotts reported Adjusted EBITDA for full fiscal year 2021 of $902.6 million, an increase from the $776.6 million of Adjusted EBITDA the Company had reported for full fiscal year 2020. The same press release highlighted that Scotts' "leverage ratio at the end of the quarter was approximately 2.7 times average debt-to-EBITDA."

37.     During the accompanying earnings conference call held later that day, CEO Hagedorn claimed: "[W]e see a higher level of sustainable growth with our existing brands . . . based largely on our ability to reach a new generation of consumers." CEO Hagedorn also emphasized that the Company "just finished [its] third straight record year and remain[s] extremely optimistic[,]" stating that "every cut of the data tells us [consumers] have stayed with the category and our brands throughout this past season." Also on the call, CFO Miller added that "as it relates to inventory, we find ourselves in a very good place right now."

38.     On February 1, 2022, Scotts issued a press release announcing its financial results for the fiscal first quarter of 2022. Therein, the Company announced that it was increasing its full-

year U.S. Consumer segment sales guidance due to "better-than-expected results in the U.S. Consumer, coupled with the additional pricing actions that will take effect in the third quarter."

39.     During the corresponding call with investors that day, CFO Miller reported the Company's leverage ratio was at "3.3 times at the end of Q1." During the question-and-answer portion of the call, William Blair analyst Jon Andersen noted Scotts had "taken your numbers up" for the U.S. Consumer segment, suggesting a "certain degree of confidence." The analyst then inquired whether the confidence was coming from "some real time data." In response, CEO Hagedorn highlighted the "POS [(point of sale)] data, for sure is good" before noting that the Company realized a "much earlier and successful kind of load into retail."

40.     On May 3, 2022, Scotts issued a press release announcing its financial results for the fiscal second quarter of 2022, which ended on April 2, 2022. The press release reported Scotts' Adjusted EBITDA for the quarter as $429.6 million. During the accompanying earnings conference call held that same day, CFO Miller noted that the Company's "leverage ratio" now stood at "3.8 times" Adjusted EBITDA.

41.     During the same call, CEO Hagedorn explained that "the lack of capacity in the short term meant we also had to build and hold more inventory to ensure we could service the needs of our retail partners." However, CEO Hagedorn assured investors that the Company was "tracking to do even better," noting that weather was the Company's "biggest challenge" when it came to moving through inventory. Additionally, Division President Hagedorn later claimed on the call that although inventories were high, "peak selling is happening now."

42.     On June 8, 2022, the truth began to emerge when Scotts issued a press release admitting that replenishment orders from its U.S. retailers in the U.S. Consumer segment were more than $300 million below the Company's target in the month of May alone. Describing the

sales decline as a "trend," the press release noted the sales miss "put significantly greater pressure on our fixed cost structure." The press release further revealed the Company was slashing is fiscal year 2022 sales guidance, with Scotts now expecting U.S. Consumer sales to decline 4% to 6% and with Hawthorne sales also expected to decline 40% to 45% for fiscal year 2022. The Company also announced plans to take on additional debt to cover restructuring charges as it attempted to cut costs. Nevertheless, Defendants continued to mislead investors about Scotts' inventory levels by claiming in the same press release that "[i]f the Company underestimates or overestimates demand for its products and does not maintain appropriate inventory levels, [the Company's] net sales and/or working capital could be negatively impacted."

43.     Analysts were shocked by the Company's disclosures, as reflected in a report by Truist proclaiming that, "[w]e have not seen anything similar occur in the 20 years we have covered [Scotts]." As a result of this news, the price of Scotts common stock shares declined by $9.05 per share, or nearly 9%, from a closing price of $102.18 per share on June 7, 2022, to a closing price of $93.13 per share on June 8, 2022, on extraordinary trading volume.

44.     Despite these revelations, Defendants continued to mislead investors by downplaying the Company's inventory and debt covenant issues. Unbeknownst to investors, at this time, the Company had already overpurchased inventory that it was not able to sell and was burdened with debt covenants that it was on the verge of breaching.

45.     On August 3, 2022, Scotts issued a press release announcing its financial results for the fiscal third quarter of 2022, which ended on July 2, 2022. The press release reported Scotts' Adjusted EBITDA for the quarter as $209.6 million, well below the $357.1 million of Adjusted EBITDA the Company reported in the same period in the prior year. The press release further noted that the "Company's debt-to-EBITDA ratio at the end of the quarter was 5.1 times."

Nevertheless, CFO Miller was quoted in the press release, stating that the "recent amendment to our credit facility provides flexibility up to 6.5 time[s] debt-to-EBITDA" and that "we are taking aggressive steps to reduce our leverage as quickly as possible."

46. During the accompanying earnings conference call that day, CFO Miller assured investors, "[W]e would expect leverage to peak in the March quarter at approximately 6 times." CFO Miller further assured investors that "given the recent amendments to our credit facility, we are comfortable we have the room to navigate." Finally, CFO Miller explained to investors that a "good portion" of the Company's higher reported inventory levels were due "to every unit just costing more with cost increases."

47. On November 2, 2022, Scotts issued a press release announcing its financial results for the fiscal fourth quarter and full year of 2022, which ended on September 30, 2022. Therein, the Company reported that its "debt-to-EBITDA ratio at the end of the quarter was 6.0 times." In addition, the Company announced a change to the manner in which it calculated relevant financial metrics:

> Beginning with the three months ended September 30, 2022, equity in income / loss of unconsolidated affiliates is excluded from the calculation of non-GAAP Adjusted EBITDA. This exclusion is consistent with the calculation of that measure as required by the Company's borrowing arrangements. This change has been reflected in the calculation of Adjusted EBITDA for the three and twelve months ended September 30, 2022. The prior period amounts have not been reclassified to conform to the revised calculation.

48. Later that same day, during the accompanying earnings conference call, an analyst asked about the Company's EBITDA growth and how Scotts was going to sustain its leverage ratio compliance. In response, Interim CFO Evans stated, "I can just tell you that the EBITDA growth that we have built in our plan is, today, I mean, we're not presenting a plan that says we're going to be in default. I mean, we're presenting a plan that says we will be in compliance." On the same

call, CEO Hagedorn claimed, "I'm optimistic we will remain within the bounds of our bank covenants."

49.     On February 1, 2023, Scotts issued a press release announcing its financial results for the fiscal first quarter of 2023, which ended on December 31, 2022. Therein, the Company reported Adjusted EBITDA of $21.2 million and that its "average debt-to-EBITDA ratio at the end of the quarter was 5.9 times, within the covenant maximum of 6.25 times."

50.     During the accompanying earnings conference call held later that day, CEO Hagedorn compared the Company's financial performance to its internal projections, highlighting, "[n]et sales that beat the plan by nearly $25 million; gross margin improvement of almost 300 basis points against our plan; EBITDA of $21 million against an internal forecast of zero; net leverage of 5.9 times debt-to-EBITDA comfortably within the covenant maximum of 6.25 times." Later on the call, CEO Hagedorn claimed, "I don't think we have a[n] inventory problem at all[,]" while CFO Garth touted that Scotts had "record December shipments."

51.     On March 6, 2023, during the Raymond James Institutional Investors Conference, CFO Garth represented to investors that the "[f]irst quarter proved that we were able to stay within our covenant 5.9 times against the 6.25 covenant[,]" before repeating that Scotts had experienced "record December shipments."

52.     On May 3, 2023, Scotts issued a press release announcing its financial results for the fiscal second quarter of 2023, which ended on April 1, 2023. The Company reported Adjusted EBITDA for the quarter of $404.8 million and that "the Company's average net debt-to-EBITDA ratio at the end of the quarter was 6.0 times versus the covenant maximum of 6.5 times."

53.     During the accompanying earnings conference call held later that day, CFO Garth reported "lower shipment volumes . . . related to our expectation for reduced retail inventory levels

which are down 6% in units versus the prior year." CFO Garth further claimed that Scotts "pulled back on production volumes and we are selling through higher cost inventory." On the same call, CEO Hagedorn stated the Company was "living within [its] credit facility covenants" and "do[es] not see leverage compliance issues going forward as [it's] looking at the low-5 times range by fiscal year end." CEO Hagedorn also touted that the "team on consumer has just really killed it," which was "really, really important for us to avoid covenant hell" in the first half of the year.

54.     The above statements set forth above in ¶¶ 34-53 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose that: (1) Scotts had an oversupply of inventory that far exceeded consumer demand prior to the start of the Class Period; (2) Defendants engaged in a channel-stuffing scheme to saturate the Company's sales channel with more product than those retailers could sell through to consumers; (3) Scotts was only able to satisfy its debt covenants through its channel-stuffing scheme; and (4) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Is Fully Revealed

55.     The truth was fully revealed before the markets opened on August 2, 2023, when Scotts issued a press release announcing its financial results for the fiscal third quarter of 2023, which ended on July 1, 2023. In the press release, Scotts disclosed that it had amended its debt covenants, including an increased debt-to-earnings ratio. For example, the Company revealed that it had to modify its debt covenants to permit a 7.00 times debt-to-EBITDA ratio, from the original covenant that only permitted a 6.25 times debt-to-EBITDA ratio.

56.     That same day, during the accompanying earnings conference call, Defendants revealed that quarterly sales for the quarter had declined by 6%, and gross margins had fallen by 420 basis points. The Company also again slashed fiscal-year 2023 guidance by a staggering 25% and announced it had to take a $20 million write down for "pandemic driven excess inventories."

57.     Analysts were once again shocked by these revelations. Analysts at Wells Fargo called the news a "[t]otal earnings destruction" and "one of the worst years on record with [Scotts] issuing a [fiscal year 2023] guidance implying [earnings per share ("EPS")] below $1/[share]." In another report, the same analysts called this "historic cut to EPS . . . eye-popping to us[,]" noting that "several decades of earnings [are] gone (one will be hard-pressed to find any year below $2 let alone $1)."

58.     As a result of this news, the price of Scotts common stock shares dropped another $13.58 per share, or 19%, from a closing price of $71.44 per share on August 1, 2023, to a closing price of $57.86 per share on August 2, 2023, on extraordinary trading volume.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that purchased Scotts common stock between June 2, 2021 and August 1, 2023, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least

hundreds or thousands of members in the proposed Class. Throughout the Class Period, Scotts shares actively traded on the NYSE (an open and efficient market) under the symbol "SMG." Millions of Scotts shares were traded publicly during the Class Period on the NYSE. As of May 3, 2024, the Company had more than 56.7 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Scotts or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)     whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b)     whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c)     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Scotts;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Scotts;

e)      whether the market price of Scotts common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

64.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

65.      The market for Scotts common stock was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Scotts common stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased Scotts common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Scotts and have been damaged thereby.

66.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Scotts common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or

misleading because they failed to disclose material adverse information and/or misrepresented the truth about Scotts' business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

67.     As alleged herein, Defendants acted with scienter in that Defendants: knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

68.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Scotts, their control over, receipt, and/or modification of the Company's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Scotts, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

69.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this

Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

70.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Scotts who knew that the statement was false when made.

## LOSS CAUSATION

71.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

72.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Scotts common stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Scotts common stock fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

73.     The market for Scotts common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to

disclose particularized in this Complaint, Scotts common stock traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Scotts common stock and market information relating to Scotts and have been damaged thereby.

74. At all times relevant, the market for Scotts common stock was an efficient market for the following reasons, among others:

a) Scotts common stock was listed and actively traded on the NYSE, a highly efficient and automated market;

b) As a regulated issuer, Scotts filed periodic public reports with the SEC and/or the NYSE;

c) Scotts regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d) Scotts was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

75. As a result of the foregoing, the market for Scotts common stock promptly digested current information regarding Scotts from all publicly available sources and reflected such information in the price of Scotts common stock. Under these circumstances, all purchasers of Scotts common stock during the Class Period suffered similar injury through their purchase of common stock at artificially inflated prices, and a presumption of reliance applies.

76. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against All Defendants**

77. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Scotts common stock; and (iii) cause Plaintiff and other members of the Class to purchase Scotts common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

79.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Scotts common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

80.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Scotts' business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Scotts' business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Scotts and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

81.     Each of the Individual Defendants' primary liability and controlling-person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level

executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

82.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Scotts' operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock.  As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

83.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Scotts

common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the markets in which the common stock traded or trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class purchased Scotts common stock during the Class Period at artificially inflated prices and were damaged thereby.

84.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Scotts was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased Scotts common stock, or, if they had purchased such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

85.     By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

86.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against All Individual Defendants

87.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

88.     The Individual Defendants acted as controlling persons of Scotts within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

89.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

90.     As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## **PRAYER FOR RELIEF**

91.     WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

92. Plaintiff demands a trial by jury.

Dated: July 26, 2024

Respectfully submitted,

By: */s/ Robert R. Sparks*
**STRAUSS TROY CO., LPA**
Richard S. Wayne, Attorney Bar No. 0022390
William K. Flynn, Attorney Bar No. 0029536
Robert R. Sparks, Attorney Bar No. 0073573
150 East Fourth Street, 4th Floor
Cincinnati, OH 45202
Tel.: (513) 621-2120
Fax: (513) 629-9426
Email: rswayne@strausstroy.com
          wkflynn@strausstroy.com
          rrsparks@strausstroy.com

*Liaison Counsel for Plaintiff City of Inkster Policemen and Firemen Retirement System*

**SAXENA WHITE P.A.**
Lester R. Hooker (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
Email: lhooker@saxenawhite.com

-and-

Rachel A. Avan (*pro hac vice* forthcoming)
Marco A. Dueñas (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
Email: ravan@saxenawhite.com
       mduenas@saxenawhite.com

*Counsel for Plaintiff City of Inkster Policemen and
Firemen Retirement System*

**ASHER KELLY**
Cynthia J. Billings-Dunn
25800 Northwestern Highway, Suite 1100
Southfield, MI 48075
Tel.: (248) 746-2747
Email: cbdunn@asherkelly.com

*Additional Counsel for Plaintiff City of Inkster
Policemen and Firemen Retirement System*